# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

TLO, LLC,                                                    Case No. 13-20853-BKC-PGH

       Debtor.                                          Chapter 11

_____/

JAY BERNSTEIN, GENE BERNSTEIN,
PETER RIPP, BARBARA RIPP, BRIAN
BACHMAN, HUNTER CREEK, LLC,
and JHBTLO, LLC,

       Plaintiffs,

v.                                                           Adv. Pro. 14-xxxx-PGH

TECHNOLOGY INVESTORS, INC.

       Defendant.

_____/

## COMPLAINT

Jay Bernstein, Gene Bernstein, Peter Ripp, Barbara Ripp, Brian Bachman, Hunter Creek, LLC, and JHBTLO, LLC (the "**Equity Interest Holder Plaintiffs**"), as parties in interest in the above-captioned Chapter 11 case ("**Main Bankruptcy Case**"), by and through undersigned counsel, allege claims for relief against Defendant Technology Investors Inc. ("**Tech Inc.**" or "**Defendant**"), as to Tech Inc.'s proofs of claim numbers 35 ("**Claim No. 35**") and 36 ("**Claim No. 36**" and, together with Claim No. 35, the "**Disputed Claims**"), each in the total amount of $89,110,685.69 ("**Alleged Debt**"). This Complaint challenges the Disputed Claims and seeks the entry of an order (a) disallowing and expunging Claim No. 36 to the extent that it is duplicative of Claim No. 35 and otherwise without merit, (b) determining the validity, priority and enforceability of Tech Inc.'s lien against Debtor's assets and their proceeds by way of

recharacterizing Tech Inc.'s surviving claim from debt to equity and providing related relief, and (c) determining the validity, priority and extent of Tech Inc.'s equity interest.  In support of the requested relief, the Equity Interest Holder Plaintiffs state as follows:

## Preliminary Statement

1.      Notwithstanding that certain loan documents and recorded instruments exist between TLO, LLC ("**Debtor**") and the Defendant as the Debtor's primary equity founder and managing member, and that the Debtor attempted to have its equity members retroactively acknowledge same as part of an amended operating agreement, the true nature and substance of the capital funding transaction between the Debtor and Defendant is an equity investment, not a loan.

2.      The Debtor -- as a prospective multi-million dollar company with a projection of years before turning a profit -- was initially undercapitalized with only a $1000 contributed by its founding members, including the Defendant.

3.      The Debtor could not obtain sufficient working capital from any outside lending institution, so Defendant -- as the Debtor's primary founder and managing member -- infused over $80 million for working capital purposes, in which a revolving "note" in the amount of $125 million was drawn up and reconciled only after a series of operating advances were made.

4.      The terms of Defendant's shareholder "loans" are specious without many of the markers of true commercial debt instruments.  The Debtor never made any interest or principal repayments on the "loans," and the Debtor's founder expressed his intention to equity investors to convert the debt as equity and, upon information and belief, even executed a UCC-3 termination statement prior to his untimely death without the termination documents ever being filed or having the debt converted into equity.

5.    The Debtor presented Tech Inc.'s funding in a written business plan and prospectus to non-insider investors as being an "initial cash investment by [TLO's] founder of over $150 million" and that TLO had "no debt." Based on these representations, the Debtor sought and obtained millions of dollars in additional working capital from non-insider equity investors since the Debtor did not and could not obtain a working capital loan from an outside lending institution.

6.    In the Debtor's bankruptcy, while Defendant was provided with replacement liens on the Debtor's assets in connection with the Debtor's use of cash collateral, such replacement liens were provided only to the extent of the validity and enforceability of its prepetition lien debt, which is being challenged here and by other parties in interest in a related adversary proceeding.  In fact, the cash collateral orders that Defendant negotiated specifically provided that its "findings" supporting such replacement liens were not binding on the equity holders or other interested parties.  In addition, despite Defendant's asserted first priority lien position over the Debtor's assets collateralizing its alleged $89 million prepetition debt, Defendant as managing member of the Debtor did not provide $6 million in DIP loan credit that was needed by the Debtor.  Instead, the Debtor borrowed the money from its co-CEOs at much higher interest rates than Defendant's alleged loans, in which the Defendant agreed to subordinate its position behind that of the insider DIP lenders, eroding its first lien position without requesting any additional adequate protection.

7.    Defendant filed two claims against the Debtor's bankruptcy estate, each for approximately $89 million on account of its alleged loans.  One of Defendant's claims (Claim No. 35) is an asserted secured claim, but included a reservation of rights that, to the extent its secured claim is undersecured, it shall be an unsecured claim to the extent of the deficiency.  As

the Court has recently approved the sale of the substantially all of the Debtor's assets for $154 million, the Defendant's lien claim either is fully secured or, if its debt is converted into equity, is no claim at all against the Debtor's estate. Either way, the duplicative, separately filed $89 million unsecured claim (Claim No. 36) should be disallowed and expunged at this time to avoid confusion with respect to Plan confirmation involving potentially duplicative voting and distribution rights.

**Jurisdiction and Venue**

8.    The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, because this is a civil proceeding arising under the Bankruptcy Code, and/or is an action arising in or related to the Main Bankruptcy Case filed on May 9, 2013 ("**Petition Date**").

9.    This adversary proceeding is brought pursuant to Federal Rule of Bankruptcy Procedure 3007 and 7001, and is a "core" matter as contemplated by 28 U.S.C. § 157(b).

10.    Venue is proper pursuant to 28 U.S.C. § 1409(a).

**Parties**

11.    In the aggregate, the Equity Interest Holder Plaintiffs invested $22.75 million in the Debtor and currently hold an approximately 8.1694% equity interest by virtue of holding 11.375 million member units in the Debtor priced at $2 per member unit. See ECF No. 377 in the Main Bankruptcy Case, Exhibit 1.6, *Pro Forma Capitalization Table as of June 30, 2013 attached to the Debtor's Plan.*

12.    As part of the Debtor's initial capitalization, Defendant Tech Inc. invested $800 in the Debtor and currently holds an approximately 40% equity interest by virtue of holding

54,656,000 member units priced at approximately one-thousandth of a penny per member unit. *Id.*

13.    Defendant Tech Inc. maintains corporate governance control over the Debtor, and both entities share the same address. See **Exhibit A**, *TLO Corporate Registration with the Florida Department of State*.

14.    For most of the relevant prepetition period, Hank Asher was the main principal of both Tech Inc. and the Debtor, and Tech Inc. was the managing member of the Debtor.

15.    Mr. Asher's daughters -- Eliza Desiree Asher and Carly Asher Yoost -- maintain an equity interest in the Debtor, and subsequent to Mr. Asher's untimely death, are co-CEOs of the Debtor.

### General Allegations

A.    **Debtor's Initial Undercapitalization**

16.    The Debtor was initially capitalized on or about March 25, 2009 with only $1,000 in initial equity funding from the three original founders, of which the Defendant supplied $800 of that $1,000 initial capitalization. See ECF No. 377 in the Main Bankruptcy Case, Exhibit 1.6, *Pro Forma Capitalization Table as of June 30, 2013 attached to the Debtor's Plan*. This is consistent with the testimony by one of the Debtor's CEOs at the Section 341 Meeting of Creditors held on June 6, 2013 ("**341 Meeting**") that, at the time of the Debtor's formation, the Defendant held 80% of the equity in the Debtor, which was later diluted to its approximately 40% equity interest after the influx of additional non-insider equity investments and profit interest holders.

17.    At the 341 Meeting, one of the Debtor's CEOs testified that (a) a business plan similar to the Debtor's would require a minimum of $100 million investment and management,

and (b) despite the substantial investments made to date, did not project that the Debtor would "break even" for a number of years. In other words, the Debtor expected to incur potentially a hundred million dollars of start-up costs and generate operating losses for several years.

18.     From the Debtor's inception, as amounts became due which the Debtor was unable to pay with cash on hand, cash was transferred from the Defendant to the Debtor and "reconciled" into an advance with respect to a note on a bi-annual basis.

19.     Notwithstanding that loan documents and recorded instruments exist between the Debtor and Defendant, and that Tech Inc. provided funds to the Debtor, this Complaint challenges the substance of the transaction as being an equity investment, not a true loan.

> *B.*     **Tech Inc.'s Alleged Debt**

20.     Tech Inc. asserts it is a secured creditor of the Debtor's estate (and alternatively an unsecured creditor to the extent there is a deficiency after the liquidation of its collateral) pursuant to a Revolving Promissory Note in the amount of One Hundred Twenty-Five Million Dollars ($125,000,000.00), dated January 31, 2011 ("**Note**"), and related Security Agreement and UCC-1 Financing Statement as filed with the Florida Secured Transaction Registry. *See Claims 35 and 36 filed in the Main Bankruptcy Case.*

21.     Tech Inc. declares that the Note amends, restates, and replaces a prior existing note, between TLO as borrower and Tech Inc. as lender, dated March 31, 2009 in the original principal amount of $50,000,000.00, which as of January 31, 2011 had an outstanding amount of $50,000,000.00. *Id.*

22.     Tech Inc. alleges it funded TLO in excess of $81 million prepetition, with accrued prepetition interest exceeding $7 million, aggregating its Alleged Debt of approximately $89 million. Id.

23.    However, at its inception, the Debtor expected to incur potentially a hundred million dollars of start-up costs and generate operating losses for several years after start-up. Plus, the Debtor only had $1,000 in stated equity capital from its equity founders. The purported loan documented as a Revolving Promissory Note between the Debtor and its primary equity founder, Tech Inc., does nothing to protect or compensate Tech Inc. as a purported lender for this substantial risk.  Going back beyond the title and terms of the "loan" documents created between the insider parties, the facts underlying the transactions between the Debtor and Defendant support the characterization of Defendant's funding being treated as equity, not a loan.

       i.    *Original Funding Agreement*

24.    In addition to the one thousand dollars of invested capital, on or around March 31, 2009, the Debtor and Defendant entered into a funding agreement whereby the Defendant promised to provide up to fifty million dollars ($50,000,000.00) in cash contributions to the Debtor (the "**Original Funding Agreement**").

25.    The Original Funding Agreement, though styled in the form of a loan, lacked many of the hallmarks that evidence a true loan document as opposed to a contribution of equity, and that would have been demanded by any disinterested lender in order to protect, or at least compensate, for the substantial risk in lending.  For example:

(i)    The note was in reality a series of working capital investments pursuant to which, every six months, such investments were reconciled (after the advance of capital) into the note. As part of this Original Funding Agreement, Tech Inc. actually funded $50 million to the Debtor;

(ii)    The interest rate provided for in the note was a mere 3.25% per annum, was due only upon maturity and did not compound;

(iii)    The note contained no financial or restrictive covenants, the result of which was that there could never be a default which would cause payment to become due;

(iv)    The note contained no limits on dividend payments, distributions to management or third party agreements;

(v)     Debtor was thinly capitalized; and

(vi)    An identity of interest between the Debtor and Defendant existed in that Mr. Hank Asher held 100% of the equity interests in the Defendant and, at least initially, Defendant held 80% of the equity interests in the Debtor (now @40 %), and was the Debtor's managing member.

ii.    *Amended Funding Agreement*

26.    On or around January 31, 2011, the Defendant and Debtor entered into an amended and restated funding agreement in the amount of one hundred twenty-five million dollars ($125,000,000.00) (the **"Amended Funding Agreement"**), which amended, restated and replaced the Original Funding Agreement.

27.    Upon information and belief, Defendant funded approximately $31 million over time as part of the Amended Funding Agreement, which for the first time included a fixed maturity date (January 31, 2014). *See Claim No. 35; Claim No. 36.*

28.    The interest rate listed in the Amended Funding Agreement (a) is 3.25% per annum, (b) is due only upon maturity and (c) does not compound. *Id.* Each day, as the "loan" grew larger, the attendant risk grew and Tech Inc. was not compensated for the unpaid interest.

29.    Additionally, despite the risk involved in the transaction, the "loan" contains few financial or restrictive covenants of any type and no limits on dividend payments, distributions to management or third party agreements. *Id.*

30.    There was no alternative source of interest payments, as the Debtor had historically maintained a negative cash flow from an operating standpoint. Indeed, the Debtor could not afford interest payments for which, upon information and belief, no interest was

actually paid on the "Note." As a result, according to the Defendant, there remained over $7 million of unpaid interest as of the Petition Date. *Id.*

31.     Debtor's representative testified at the 341 Meeting that "significant efforts" were made prior to filing to collect additional funds in light of their negative cash flows. The Debtor reached out to all of its members, its investment banker and other industry personnel and further tried to negotiate their data contracts and pursue loans against its insurance policies. However, there were no offers that "were advantageous to [their] members and creditors" and the Debtor was unable to obtain the requisite funding needed.

32.     As the Debtor was only initially capitalized with $1,000 of equity capital, the proceeds of the "loan" appear to be used generally for working capital purposes. With only $1,000 in equity capital, the Debtor lacked sufficient capital to fund its start-up costs and operating losses, and it regularly requested and received funds from the Defendant, a major equity holder who had provided limited actual equity capital in return for its 40% equity stake.

33.     The "Note" created between the insider parties constitutes a series of working capital investments that were "reconciled" into the Note every 6 months and after the date of the actual advance of capital. The Defendant presumably financed the Debtor's operations to protect the value of its equity stake in the company. Further, as discussed herein, despite the use of the "loan" proceeds for working capital purposes, the funds were presented to outside equity investors as being an "initial cash investment by [TLO's] founder" and that TLO had "no debt."

C.     **Equity Interest Holder Plaintiffs' Investments into the Debtor**

34.     The Equity Interest Holder Plaintiffs invested their capital with the Debtor between September 27, 2011 and December 15, 2011.

35.    Prior to investing capital with the Debtor, Mr. Hank Asher presented investors with the Debtor's comprehensive business plan and marketing materials ("**Business Plan**"), attached herein as **Exhibit B**.

36.    The Business Plan was prepared after Tech Inc.'s January 2011 "loan" documents, evidenced by the reference on page 3 of the Business Plan that "a beta version [of the Debtor's product] was launched in May 2011".  The Business Plan provided, among other things, that "TLO has been built on an initial cash investment by the founder of over $150 million.  At this time, *TLO has no debt . . .*" *Id.* at pg. 4 (*emphasis added*).

D.    **Debtor Could Not Obtain Conventional Loan from a Disinterested Lender**

37.    The Debtor was unable, at any point in time since its inception, to obtain conventional debt financing from any disinterested lender.

38.    Significant efforts were made by the Debtor, its professionals, and its management to collect additional funds in light of their negative cash flows including by reaching out to all of its members and other industry personnel.

39.    Upon information and belief, the Debtor even reached out to close contacts it had at a company called UPS to request that they provide debt financing to the Debtor, but UPS declined to do so.

40.    Prepetition, on or about May 27, 2012, the Debtor hired GCA Savvian Advisors, LLC ("**GCA**"), to act as its exclusive financial advisor in connections with a possible sale of assets or shares, or a merger, business combination or similar strategic transaction with another entity.  Prior to and subsequent to the formal engagement, GCA's professionals spent months working with the Debtor in preparing for a potential M&A or financing transaction, including reaching out to prospective investors or acquirers, organizing and attending due diligence

meetings and conference calls with these parties, and advising the Debtor throughout on strategic options and alternatives.

41.     Despite reaching out to numerous potential lenders and strategic investors, GCA was unable to identify any party, let alone a disinterested one, who was willing to provide conventional debt, or even equity, financing to the Debtor.

42.     As the Debtor was running out of cash around this time, Mr. Hank Asher met with and presented to numerous groups of prospective equity investors who might be interested in a potential strategic investment, telling each such group that the Debtor was 100% debt free. When he was unable to attract any additional financing, whether in the form of debt or equity, he continued to advance his own funds.

E.     **Amended and Restated Operating Agreement**

43.     In or around November 2012, the Debtor had its members sign an Amended and Restated Operating Agreement dated November 26, 2012 including the provision as follows:

> Initial Funding. The Members hereby agree and acknowledge that certain funding of the Company was provided in the form of loans from Tech Inc. to the Company (the "Loans") and that such Loans are secured by a pledge to Tech Inc. of the Company's assets to secure the Loans. Each of the Members further acknowledges the terms of the Loans and the good and valuable consideration received by each of them in connection with the funding by Tech Inc. of the Loans to the Company.

The Debtor placed this retroactive "acknowledgement" provision in the section entitled "Capital Contributions; Capital Accounts; Liability of Members".

44.     On multiple occasions, Hank Asher advised equity interest holders that he considered the Tech Inc. Note to be equity rather than debt, that it had always been his intent and plan to treat the Tech Inc. note as equity, and that he intended to convert the note to equity.

45.     Upon information and belief, Hank Asher executed a UCC-3 termination statement in or around December 2012 as a preliminary step towards terminating the Tech Inc. Note and effectuating his stated plan to convert the Tech Inc. Note to equity.

46.     Hank Asher died in early January 2013 and the UCC-3 termination statement was never filed and the Tech Inc. Note was never converted to equity.

F.     **The Debtor's Chapter 11 Proceedings**

47.     On May 9, 2013, the Debtor filed its Chapter 11 petition with Ms. Eliza Desiree Asher signing the petition as CEO of the Debtor.

48.     During the Chapter 11 proceedings, the Debtor required the use of cash and required ongoing DIP financing in order to sustain operations pending a sale of its assets as a going concern.

i.     *Cash Collateral Orders*

49.     In the Main Bankruptcy Case, the Bankruptcy Court entered three cash collateral orders (the "Cash Collateral Orders").  See Main Bankruptcy Case, ECF Nos. 59, 207, 317.  The Cash Collateral Orders authorized the Debtor's continued use of the Defendant's purported cash collateral based on a purported first priority lien held by the Defendant on all of the Debtor's assets. *Id.*

50.     As adequate protection for the use of its collateral and for any diminution in value of its collateral, the Defendant received first priority replacement liens on all cash generated post-petition from its collateral and proceeds therefrom. *Id.*

51.     Tech Inc.'s replacement liens are valid merely to the extent it holds a valid, secured lien claim against the Debtor, which is being challenged in this adversary complaint. Specifically, the Cash Collateral Orders provided that the "findings" supporting the imposition of

replacement liens in favor of Tech Inc., including but not limited to, the characterization of Tech Inc.'s prepetition funding as secured indebtedness of the Debtor and its alleged first lien position on the Debtor's assets, would not be binding on stockholders of the Debtor or other parties in interest in the case. *Id.*

        *ii.*    *DIP Finance Orders*

52.     The Debtor obtained four separate postpetition DIP loans in the aggregate available amount of $6 million ("**DIP Loans**"). See Main Bankruptcy Case, ECF Nos. 149, 303, 364, 453.

53.     The Debtor could not obtain its DIP Loans from any non-insider third party lender, and Tech Inc. did not provide any funding of the DIP Loans despite already having $89 million funded with the Debtor.

54.     Instead, the Debtors obtained their DIP Loans from their Co-CEOs as principals of the Debtor -- Ms. Eliza Desiree Asher and Ms. Carolina Asher Yoost or their irrevocable trusts. *Id.*

55.     The DIP Loans with the Debtor's principals included 9% interest per annum with security of a first position lien against the Debtor's assets, as Tech Inc. agreed to subordinate its liens against the Debtor's assets, again merely to the extent valid and enforceable, in favor of the Debtor's principals to secure the DIP Loans. *Id.*

56.     Consistent with an acknowledgement that the Tech Inc.'s Alleged Debt is not genuine secured debt, the Defendant consented to the subordination of its purported liens notwithstanding the fact that the DIP Loans did not provide for any adequate protection payments to the Defendant for the diminution in its collateral. *Id.* Also telling is the fact that interest on the relatively low-risk DIP Loans is at 9% per annum, when Defendant's supposed

loan, which was extended before TLO even began its operations and which is for eight times the amount of money advanced in the DIP loan, is at the rate of 3.25% annum. This unreasonably and artificially low interest rate is yet further evidence that Tech Inc.'s prepetition funding of the Debtor is not debt.

      iii.    *Defendant's Proofs of Claim*

57.    On September 3, 2013, Tech Inc. filed a secured claim (Claim No. 35) and an unsecured claim (Claim No. 36) in the same amount each exceeding $89 million, with the unsecured claim filed merely to preserve rights to pursue any applicable deficiency claim.

58.    Specifically, Claim No. 35 was filed in the amount of $89,110,685.69, asserting (a) a secured claim in the amount of $81,740,000.00 for principal due as of the Petition Date on account of the funding advanced pursuant to the Original and Amended Funding Agreements, and (b) accrued interest in the amount of $7,370,685.69. While Claim No. 35 was filed as a secured claim, it provided that, to the extent the Defendant is undersecured by its collateral, Claim No. 35 shall be an unsecured claim to the extent of the deficiency.

59.    The Court has approved the sale of the Debtor's assets to a third party in the approximate amount of $154 million. To the extent Tech Inc. is determined to have an allowed secured claim as filed without having such claim recharacterized as equity, then there will be enough funds in the estate to satisfy its lien claim, and there will be no unsecured deficiency claim. To the extent Tech Inc.'s debt claim is recharacterized as equity, then Tech Inc. will have no claim at all against the Debtor's estate, except for on account of any distribution to equity, as applicable.

60.    There will be a certain ratable distribution in any Chapter 11 plan to equity holders regardless of the outcome of the debt recharacterization count against Defendant, but the

amounts of the ratable distribution will be affected by this adversary proceeding, which is ripe for determination by this Court.

61.    To the extent Tech Inc.'s debt is recharacterized as equity, the Court will need to determine how to calculate and effectuate Tech Inc.'s equity conversion, including, but not limited to, determining an appropriate member unit purchase rate. In addition, to the extent the Debtor paid Tech Inc. any monies on account of the asserted loan prepetition, then, upon debt recharacterization as equity, some or all of such monies may be disgorged to be reallocated among the estate's unsecured creditors or equity holders, as appropriate.

**COUNT I**

**OBJECTION TO CLAIM NO. 36**

**(Claim No. 36 Should be Disallowed and Expunged
as Duplicative of Claim No. 35 and on its Lack of Merit)**

62.    The allegations contained in paragraphs 1 through 61 are incorporated herein by reference.

63.    Claim No. 36 is duplicative of Claim No. 35. The Disputed Claims are identical and were asserted in the exact same amount and upon the same grounds, documents and transaction with the Debtor.

64.    As the Defendant stated in Claim No. 36, it was filed "*solely* to reserve [the Defendant's] rights to assert an unsecured claim for [any] deficiency" and "should any portion of its claim prove to be unsecured." See Claim No. 36 (*emphasis added*).

65.    However, the Defendant included the same reservation of rights in Claim No. 35, indicating that "[t]o the extent [the Defendant] is undersecured by its Collateral, [Claim No. 35] shall be an unsecured claim to the extent of the deficiency." See Claim No. 35. Therefore, Claim

15

No. 36 seeks relief already provided for and sought in Claim No. 35 and is otherwise identical and duplicative.

66.     Tech Inc. currently has two separate claims against the Debtor's estate each in excess of $89 million.  Tech Inc. currently would have two votes in two separate classes and has the potential to obtain two separate distributions on its Disputed Claims when it is only entitled to one or possibly none outside of any equity interest.  This would affect the Plan and the waterfall distribution to the Equity Interest Holder Plaintiffs.

67.     Additionally, based on the Court approving the sale of substantially all of the assets for $154 million, Claim No. 36 should be disallowed and stricken on the merits.  To the extent Tech Inc.'s Alleged Debt is not recharacterized into equity, it is without question that its debt is fully secured by the collateral proceeds.  To the extent Tech Inc.'s debt is recharacterized into equity, then it has no claim against the Debtor's estate outside of its alleged equity position.

68.     There is no reason to wait to disallow and expunge Claim No. 36 when it fails on its merits and its pendency against the Debtor's estate has the potential for confusion regarding Plan Confirmation with respect to voting and distributions.

WHEREFORE, the Equity Interest Holder Plaintiffs seek an order of this Court disallowing Claim No. 36 in full and expunging it from the claims register, and for other relief this Court deems appropriate and just.

## COUNT II

### DETERMINING THE VALIDITY, PRIORITY AND ENFORCEABILITY OF TECH INC.'S LIEN AGAINST THE DEBTOR'S ASSETS

#### (Recharacterization of Tech's Inc.'s Surviving Claim as Equity and Related Relief)

69.     The allegations contained in paragraphs 1 through 68 are incorporated herein by reference.

70.     Recharacterization of Tech's Inc.'s Alleged Debt and Disputed Claims into equity is appropriate in the instant case to prevent Defendant – as an insider equity founder/shareholder/managing member of the Debtor -- from labeling its contribution as a loan, and circumventing the Bankruptcy Code's priority system by guaranteeing itself a larger recovery and higher priority upon the Debtor filing for bankruptcy.

71.     The Debtor was initially undercapitalized. The Debtor only had $1,000 in stated equity capital from its equity founders when it expected to incur potentially a hundred million dollars of start-up costs and generate operating losses for several years after start-up.

72.     Tech Inc.'s "loans" were made when no other disinterested lender would have extended credit.  The interest rate on the purported loans (a) is 3.25% per annum, (b) is due only upon maturity and (c) does not compound. The "loans" were merely a series of working capital investments that were "reconciled" into a Note every 6 months and/or "acknowledged" after the date of the actual advance of capital.  There was no alternative source of interest payments as the Debtor had historically maintained a negative cash flow from an operating standpoint. Indeed, the Debtor could not afford interest payments for which no interest was actually paid on the "loans." The "loans" also contained only few, if any, financial or restrictive covenants of any type and no limits on dividend payments, distributions to management or third party agreements.

73.     Tech Inc. provided the source of funding to the Debtor as an insider equity founder and shareholder.   Tech Inc.'s primary principal founded the Debtor, in which Tech Inc. also maintained corporate governance control over the Debtor and was its managing member.

74.     There was no right in the "loan" documents for Tech Inc. to enforce payment of principal and interest until the loan maturity date, as there were no interim default provisions or restrictive covenants.

75.    The Debtor's founder expressed an intent to some of the Debtor's non-insider equity investors to convert Tech Inc.'s debt into equity prior to any such loan maturity, and even had the Debtor execute a UCC-3 termination statement that was never filed prior to his untimely death.

76.    The Debtor's initial capitalization of the Debtor was grossly inadequate for its capital expectations, and the Debtor represented Tech Inc.'s funding to non-insider equity investors as being an "initial cash investment by [TLO's] founder" and that TLO had "no debt" in order to acquire millions of dollars of additional working capital from such investors since the Debtor did not, and could not, obtain a working capital loan from an outside lending institution.

77.    Based on the totality of the circumstances, as the Alleged Debt is comprised of a contribution of capital and risk-investment in the Debtor's business by its founding shareholder and managing member, the entire investment should be recharacterized as equity.

78.    Since the Alleged Debt is equity, the Defendant's replacement liens should be determined null and void and unenforceable against the Debtor's assets and their proceeds, and all consideration paid to Defendant on account of its investment in the Debtor, or the value thereof, should be disgorged for the benefit of the Debtor's estate and equity holders, as applicable.

WHEREFORE, the Equity Interest Holder Plaintiffs respectfully requests that the Court enter judgment in its favor:

(A) Recharacterizing the Alleged Debt owed by the Debtor to the Defendants as capital contributions such that payment to the Defendant of same, if any, is subordinated to the prior payment in full of all claims against the Debtor's estate and shall be treated among the equity interest holders class;

(B) Determining that all of Defendant's replacement liens are deemed null and void and unenforceable against the Debtor's assets and their proceeds;

(C) To the extent the Debtor paid any monies to the Defendant on account of the "loans," requiring the disgorgement of any profits, set-offs, credits and other value obtained or withheld by the Defendant for actual or potential application to the debts allegedly owed it, including, without limitation, any prepetition payments of principal or payment on account of the "loans" – with such repayments by Tech Inc. being made to the class of unsecured creditors or equity holders of the estate, as applicable;

(D) Awarding the Equity Interest Holder Plaintiffs their reasonable costs and attorneys' fees; and

(E) Providing such other and further relief as the Court may deem just and proper.

## COUNT III

### DETERMINING THE VALIDITY, PRIORITY AND EXTENT OF TECH INC.'S EQUITY INTEREST IN THE DEBTOR'S ASSETS

#### (Recalculating Tech Inc.'s Equity Interest)

79.    The allegations contained in paragraphs 1 through 78 are incorporated herein by reference.

80.    To the extent the Court determines Tech Inc.'s debt shall be recharacterized as equity, the Equity Interest Holder Plaintiffs request an order establishing a procedure to calculate and effectuate Tech Inc.'s equity conversion, including, but not limited to, determining an appropriate member unit purchase rate by and through which the Plan may implement as part of its ratable distribution to the class of equity interest holders of the Debtor.

81.    All non-insider equity interest holders, including the Equity Interest Holder Plaintiffs, paid $2 per member unit. All insider, non-founding member equity interest holders

paid $1.50 per member unit.  Tech Inc.'s initial capitalization is calculated to have been for $.00001464 per member unit.

82.    Equity Interest Holder Plaintiffs aver that the amount of Tech Inc.'s member units in the Debtor should be recalculated to account for its (a) $800 initial capitalization, and (b) $89,110685.89 of recharacterized debt as equity (or alternatively $81,740,000.00 since interest does not come into play with capital contributions), to be effectuated for the purposes of Tech Inc.'s distributions among the class of equity interest holders under any confirmed plan in the Main Bankruptcy Case at the insider equity interest holder rate of $1.50 per member unit.

83.    Alternatively, the Equity Interest Holder Plaintiffs assert that Tech Inc.'s 54,656,000 member units it already possesses is consideration for its approximately $89 million capital contribution -- which comes to approximately $1.63 per member unit (the price per member unit actually would be approximately $1.50 per member unit if calculating off the approximately $81 million contribution amount without interest which is alternatively sought here) -- without any further dilution of other equity holders' interests in the Debtor.

WHEREFORE, the Equity Interest Holder Plaintiffs respectfully request an order recalculating the amount of Tech Inc.'s member units in the Debtor to account for Tech Inc.'s initial capitalization and recharcterized debt into equity at the insider equity interest holder rate of $1.50 per member unit, or alternatively to determine that Tech Inc.'s member units it already possesses is consideration for its recharacterized capital contribution; for its reasonable costs and attorneys' fees; and for such other and further relief as the Court deems just and proper.

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

**Dated:** January 31, 2014

Respectfully Submitted

KOZYAK TROPIN & THROCKMORTON, P.A.
Counsel for the Equity Interest Holder Plaintiffs
2525 Ponce De Leon, 9th Floor
Miami, Florida 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email: clc@kttlaw.com
       das@kttlaw.com

By:    /s/ Corali Lopez-Castro
       Corali Lopez-Castro
       Florida Bar No. 863830
       David A. Samole
       Florida Bar No. 582761